## Illinois Central Railroad Company v. Outland's Administratrix.

(Decided November 6, 1914.)

Appeal from Graves Circuit Court.

1. Railroads—Death From Collision With Train at Public Crossing—Damages—When Recoverable.—Where, in an action against a railroad company to recover damages for the death of the plaintiff's decedent from a collision with one of the railroad company's trains at a public crossing in the populous section of a city, there was evidence conducing to prove negligence on the part of the railroad company's servants in charge of the train, either in running it at an unsafe rate of speed or in failing to give proper signals of its approach; or negligence on the part of its flagman stationed at the crossing in failing to warn the decedent of the coming of the train, it was proper for the trial court to submit to the decision of the jury the question whether the decedent's death was caused by such negligence, if any, on the part of those operating the train, or the flagman, although an equal number of witnesses for the railroad company testified as to facts tending to show the absence of such negligence.

2. Railroads—Running of Trains in Cities and Towns—Care to be Used in Operating Same.—In cities and towns where the population is dense and the streets are occupied or crossed by the tracks of a railroad company, the latter is bound to operate its trains, both day and night, at a safe rate of speed, give the customary notice of their approach, maintain a proper lookout, and take such

other precautions as circumstances and the exercise of ordinary care may require for the security of life.

3. Railroads—Persons Using Streets Occupied or Crossed by Railroad Tracks—Care to be Used by.—Persons, whether pedestrians or drivers of vehicles, in using streets or crossings of such city or town have a right to assume that those in charge of railroad trains operated thereon will give the customary signals of the movements thereof on the streets or crossings, maintain a proper lookout and properly reduce their speed, but must at the same time use ordinary care for their own safety. And if one injured or killed by a train upon the street or at a crossing failed to use such care, and such failure contributes to his injury or death to such an extent, that, but for same he would not have been injured or killed, no liability should be fastened upon the railroad company for such injury or death.

4. Railroads—Instructions—When Regarded Sufficient.—Instructions, though in some respects inaptly expressed, which, with substantial correctness, defined the duties of the railroad company's servants in operating the train, its watchman at the crossing, and of the decedent as well; and advised the jury what act or omission on the part of either or any of them would constitute negligence; and which also defined negligence, contributory negligence, ordinary care, and the measure of damages, will be regarded as having fairly stated for the guidance of the jury the entire law applicable to the issues of fact in a case of death at a street crossing.

5. Railroads—Gross Negligence—When it Will Authorize Recovery of Punitive Damages.—Where there is evidence conducing to prove that the death of one killed at a street crossing by a railroad train was caused by the gross negligence of the railroad company's servants in charge of the train, it was not error for the court to instruct the jury that they might, in their discretion, award punitive damages, in addition to reasonable compensation, for such death.

6. Evidence—Declarations of Actor in Transaction—When Not Admissible as Part of the Res Gestae.—Declarations admissible as part of the res gestae must, as a general rule, be made by one of the actors in the affair, contemporaneously in point of time with the particular transaction, at or near to the place of its occurrence, and must explain the main fact; but a declaration so far removed in point of time from the main fact as to make it a mere narrative of a past transaction, or a declaration which does not explain the principal fact, or which was made at some distance from the place of its occurrence, is not admissible as substantive evidence as a part of the res gestae. Tested by this rule, the exclusion by the trial court of certain testimony on the ground that it was not a part of the res gestae was not error.

7. Witnesses—Rejection of Witness Under Rule—When Not Error.— Whether a witness who has remained in the court room during the hearing of evidence, notwithstanding an order from the court excluding all the witnesses after being sworn, shall be permitted

to testify, is a matter resting in the sound discretion of the court, and unless it is made to appear that this discretion has been abused, it will not be interfered with by the appellate court.

8.  Removal of Causes—Failure of Jury to Make Finding as to Resident Defendant—When Not Sufficient to Authorize Removal of Cause to Federal Court as to Non-resident Defendant.—In an action against a resident defendant and non-resident defendant, there being abundant evidence to show that the negligence of the resident defendant concurred with that of the non-resident defendant in causing the death of the decedent, it does not follow that the failure of the jury to return a verdict against the resident defendant manifests the bad faith of the plaintiff in making him a co-defendant with the non-resident defendant in the action to recover damages for the decedent's death, which would of itself entitle the non-resident defendant to a removal of the cause to the Federal Court. If the plaintiff is entitled to his verdict against two tort feasors, but the jury are able to agree only as to one of them, and gives a verdict accordingly, the law will not prevent the plaintiff from having, at least, what the jury has given him; and if in any case joint negligence is in good faith asserted and in like good faith relief be claimed thereon in the petition, the joinder of the resident with a non-resident defendant, notwithstanding the failure of the jury to return a verdict against the former, was efficient to prevent the removal.

9.  Damages—When Not Excessive.—As in this case the decedent was but twenty-five years of age at the time of his death, in excellent health and of industrious habits, his expectancy of life thirty-nine years, and his average earnings $600.00 per year, it cannot be said that the $9,000.00 awarded the plaintiff by way of damages will more than reasonably compensate the decedent's estate for the loss of his life. Hence it is not clear that there were any punitive damages included in the amount awarded. This leaves no ground for the complaint that the verdict is excessive.

ROBBINS & ROBBINS, BLEWETT LEE, C. F. SIVLEY and TRABUE, DOOLAN & COX for appellant.

STANFIELD & STANFIELD for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

This is an appeal from a judgment of the Graves Circuit Court, entered upon a verdict awarding appellee, as administratrix of the estate of her deceased husband, O. N. Outland, $9,000.00 damages for his death, caused, as alleged, by the negligence of appellant's flagman at the crossing of Broadway street by its railroad tracks in Mayfield, and the negligence of other of its servants in charge of a passenger train which ran over and killed the decedent at the crossing in question. The appellant company and its flagman, Martin Irvin, were

joined as defendants, it being alleged in the petition that the decedent's death was caused by their joint and concurrent negligence.

The appellant railroad company and its co-defendant, Martin Irwin, filed separate answers to the petition, each of which admitted the killing of the decedent by the train, but denied that his death was caused by the negligence of either of them. Each answer pleaded contributory negligence upon the part of the decedent, which plea was controverted by the reply filed to each answer.

On the trial the court instructed the jury that they could find a verdict in favor of the plaintiff against both defendants, or could find a separate verdict against them, fixing one amount to be paid by one defendant and another amount by the other defendant, or that they might find for one defendant and against the other or in favor of both defendants. The jury returned a verdict against the appellant railroad company, but made no finding either for or against the other defendant, Martin Irvin. The verdict, however, was interpreted by the court as being a finding in favor of Irvin, and by reason thereof a judgment was entered dismissing the petition as to Irvin and awarding him his costs.

The evidence heard upon the trial is very voluminous. There were forty witnesses introduced by the appellee and thirty in behalf of the appellant. Much of the evidence was conflicting, but our analysis of it shows the following state of facts: The decedent was killed where appellant's railroad tracks cross one of the principal streets known as Broadway, in a populous section of the city of Mayfield. The decedent was approaching the crossing upon a coal wagon drawn by a pair of horses he was driving. The train which struck and killed him was a fast mail train going north and consisted of an engine, tender and six cars. It was a solid steel train, from thirty to forty-five minutes behind its schedule time of arriving at the Mayfield station. The great weight of the evidence tended to show that, at the time of striking the decedent, the train was running at a speed of twenty-five or thirty miles per hour. South of the crossing there is a cut and curve almost forming a semicircle in the railroad track, between which and the crossing stands an embankment containing, next to the crossing, a building and other obstructions which intercepted the view from the cross-

ing and prevented one approaching the crossing on a wagon or other vehicle from seeing a train on the curve or beyond it. In fact, it appears from the weight of the evidence that one upon or near the crossing, whether upon a wagon or afoot, is unable to see a train coming north until it emerges from the cut.

On the occasion in question, as the decedent drove toward and reached the crossing, the horses attached to his wagon were going in a walk or slow trot, and before driving upon the crossing he seemed to have stopped or checked them, evidently for the purpose of ascertaining whether there was any danger to be apprehended from the coming of a train. As the horses attached to the wagon got upon the railroad track the engine of the belated train made its appearance at Water street, nine hundred feet from the crossing, where it was for the first time seen or could be seen by the decedent, and it reached the crossing and struck the wagon while it was upon the track. In this collision the engine came in contact with the body of the decedent, causing his death. It appears from the evidence that the decedent was a very careful and prudent driver, and that there was much noise being made at the time of the accident by the movements of a nearby freight train and the unloading of coal a short distance away. While there were several other teams in charge of drivers near the crossing at the time the decedent was killed, none of them, according to their testimony, seemed to be aware of the coming of the train until the decedent's team got upon the track and it was too late for him to make them pull the wagon across the track or back the team therefrom, out of the way of the train. Many witnesses introduced for appellee testified that no signal was given of the train's approach until it was too late for the decedent to avoid the collision; while numerous witnesses for appellant, among them the train crew, testified that the whistle was blown about the time the train entered the corporate limits of Mayfield and that therefrom until the crossing was reached the customary signal of its coming was given by the ringing of the engine bell.

Martin Irvin, the watchman at the crossing, who was jointly sued with the appellant, testified that he was standing at a point twenty-five or thirty feet north of his flag house at the time the decedent drove up, and that he had a green flag in his hand which he was holding out in a horizontal position; that just before the

decedent's horses got to the railroad track he waived the flag to him to stop and called to him to "look out, son," but that notwithstanding the warning he whipped the horses and drove ahead until they got beyond the track, and the wagon was on the track or getting on it, when struck by the engine of the train. Irvin was in some measure corroborated in these statements by Hester and Somerville. But a greater number of witnesses introduced by appellee, in better positions to see and hear, testified that Irvin made no attempt to warn the decedent of the coming of the train or to stop him until his horses had gotten upon or across the track, and that the waiving of a flag in the hands of a watchman at a crossing was usually understood by the public using the crossing as a signal that persons or teams intending to cross the railroad track could do so with safety. These witnesses did not see the waiving of a flag in Irvin's hands until after the decedent's team got upon or across the track.

There was a diversity of opinion, even among the appellant's witnesses, as to the speed of the train in approaching the crossing. The engineer said it was going at about fifteen miles per hour and the conductor said its speed was fifteen to eighteen miles per hour, while several other witnesses testifying for appellant said the train was running at a speed of from twenty to twenty-five miles per hour; and there was no contrariety of evidence as to the fact that it was from thirty to forty minutes behind its scheduled time. There was also a contrariety of evidence as to the distance the train ran after striking the decedent before it was stopped. The emergency brakes were put on, according to the engineer's statement, sixty feet south of the crossing, and the engine was stopped in front of appellant's ticket office at the passenger depot, 450 feet north of the crossing. According to the measurement of T. J. Murphy, another witness, Broadway street at the crossing is sixty-six feet in width, so after the emergency brakes were applied the engine ran 576 feet before it was stopped. Other witnesses testified that the engine stopped in front of appellant's water tank, which was shown by measurement to be 150 feet north of the ticket office, and if it did not in fact stop until it got to the water tank, it ran 726 feet after the emergency breaks were applied before it was stopped. Further evidence of the speed of the train at the time the decedent was

killed was furnished by the fact that the force of the collision was such that his body was knocked upward and thrown or carried by the engine a distance of ninety feet from the point of the collision. It is fairly apparent from the evidence as a whole that the speed of the train was so great that, but for the sudden application of the emergency brakes and the collision, it would have gone beyond the station before stopping.

We are convinced from our reading of the record that there was abundant evidence conducing to prove negligence upon the part of appellant's servants in charge of the train; not only in running it at the rate of speed employed at the time of the decedent's death, but also in failing to give proper signals of its approach. The facts here furnished by the evidence are very similar to those appearing in the case of C. & O. Ry. Co. v. Dixon's Admx., 104 Ky., 608, in respect to which the court said:

"There is evidence tending to show, and from which the jury could reasonably find, that those in charge of the train were guilty of negligence in two respects: First, in failing to give proper signal of the approach of the train to the crossing; second, considering that the crossing was within the limits of a city, the fact of the number of people usually crossing at that place in vehicles and on foot, and the short distance that the track could be seen therefrom, looking eastward, it was a high degree of negligence to move the train when near the crossing at even the rate of speed admitted by the engineer it was moving."

It further appears from the opinion that the engineer testified in that case that the train was going, at the time of striking the decedent, from fifteen to twenty miles per hour.

The railroad crossing where the decedent in the instant case lost his life, is practically in the heart of Mayfield, a city of from seven to eight thousand population, and on its principal street. The crossing is more used by vehicles and pedestrians than any other in the corporate limits of the city, which fact, together with the obstructions in the way of seeing, from the crossing and approaching it the coming of trains until within a short distance of it, necessarily makes it a place of great danger to those compelled to use it. We have repeatedly held that in cities and towns where the population is dense and the streets are occupied by the tracks of a

railroad company, the latter is bound to operate its trains, both day and night, at a safe rate of speed, give the customary notice of their approach, maintain a proper lookout, and take such other precautions as circumstances and the exercise of ordinary care may require for the security of life. C. & O. v. Booth, 149 Ky., 245; L. & N. v. McNary's Admr., 123 Ky., 787; I. C. R. Co. v. Flaherty, 139 Ky., 147; L. & N. v. Potts, 92 Ky., 30; L. & N. v. Cummins' Admr., 111 Ky., 333; Rader's Admr. v. L. & N., 126 Ky., 722; L. & N. v. Trissler, 140 Ky., 447.

Should injury or death result to any person on a street or crossing of the municipality, using ordinary care for his own safety, because of the failure of those operating a train to observe these precautions, or any of them, such failure will constitute negligence, for which the railroad company will be liable in damages. Persons, whether pedestrians or drivers of vehicles, using such streets or crossings have a right to assume that those in charge of railroad trains operated thereon, will give the customary signals of the movements thereof on the streets or crossings, maintain a proper lookout, and properly reduce their speed, but must at the same time use ordinary care for their own safety. So if one injured or killed by a train upon a street or at a crossing fail to use such care, and such failure contributes to his injury or death to such an extent that, but for same he would not have been injured or killed, no liability should be fastened upon the railroad company for such injury or death.

We find no reason for disturbing the verdict, either on the ground that there was a failure of evidence as to the negligence of appellant's servants in charge of the train by which the decedent was killed, or that there was conclusive evidence of contributory negligence on the part of the decedent. The case was, therefore, properly submitted to the jury, and our duty goes no farther than to determine whether there was evidence to support the verdict. As it is supported by the evidence, it must stand, unless it is apparent from the record that the trial court so erred in some of its rulings as to have prejudiced a substantial right of the appellant, and whether there was such error only remains to be considered.

The objections interposed by appellant to the instructions can not be sustained. Without discussing all these it may be said that the instructions, though in some

respects inaptly expressed, properly defined the duty of appellant's servants in charge of the train, its watchman at the crossing, and that of the decedent as well; and advised the jury what act or omission on the part of either or any of them would constitute negligence. They also properly defined negligence, contributory negligence, ordinary care and the measure of damages; and as a whole fairly stated for the guidance of the jury the entire law applicable to the issues of fact submitted to them.

Instructions Nos. 12 and 13 offered by appellant were properly refused by the court. The doctrine announced in No. 12, which, if given, would have told the jury that it was the duty of the decedent before driving upon the railroad crossing to stop, look and listen for the coming of the train, has never been approved in this jurisdiction. Instruction 13 was probably intended by counsel for appellant to submit to the jury their contention that, as this crossing was exceptionally or unusually dangerous, then it was incumbent upon appellee's decedent to exercise increased care commensurate with the danger; and that if he failed to exercise such care and by reason thereof was killed, his personal representative was not entitled to recover damages for his death. The instruction in the form offered would have given undue emphasis to the care required of the decedent and minimized that required of appellant's flagman and trainmen. The instructions given covered this point, as they advised the jury that ordinary care was required on the part of the decedent as well as the flagman and trainmen. We do not think such an instruction as that offered proper, where, as in this case, a flagman has been stationed at the crossing for the purpose of warning the traveler. We do not mean to say that the decedent should have relied solely upon the flagman to give him notice of the danger, and the court in this case so instructed the jury, but that with a flagman stationed at the crossing to warn persons using it of the approach of trains it was sufficient to instruct the jury, as was done, that the decedent in using the crossing was only required to use ordinary care for his own safety. To have instructed them as asked by appellant in instruction 13 would have been, in effect, to tell them that while the flagmen and trainmen were required to use only ordinary care, the decedent must have used a higher degree of care.

In Cross v. I. C. R. Co., 33 R., 432, a case in which an

injury was inflicted by a train at the same crossing where the decedent met his death, the circuit court was directed to give on a retrial of the case instructions telling the jury, in substance, that if the plaintiff failed to exercise ordinary care for his own safety and by reason thereof was injured, there could be no recovery, and that it was the duty of the flagman at the crossing, "to give persons approaching said crossing warning of the approach of trains, so as to give them a reasonable opportunity to avoid being injured in crossing the track. * * *;"

The above instruction was followed by the trial court in this case in defining the duty of appellant's flagman, and while the instruction given does not use the words "ordinary care" as applied to the flagman, it can have no other meaning than that it was incumbent on him to use ordinary care to warn persons approaching the crossing of the danger to be apprehended from the coming of trains. It is manifest from the failure of the jury to return a verdict against the flagman, that they did not regard his negligence the proximate cause of the decedent's death; but the finding against the appellant unmistakably indicated that, in the opinion of the jury, the death of the decedent was caused by the negligence of its servants in charge of the train, arising from their running of the train at too great a rate of speed or their failure to give the customary signals of its approach, or both.

Appellant's objection to instruction No. 4, given by the court, is in our opinion also untenable. In that instruction the jury were in substance told that if they believed from the evidence that the negligence of the defendants, or either of them, if any, was gross, as defined, they might in their discretion award the plaintiff exemplary damages. It is appellant's contention that the failure, if any, of the engineer to reduce the speed of the train or to give the customary signals of its approach, did not constitute gross negligence, and, therefore, the recovery of exemplary damages was not permissible. In L. & N. v. Roth, 130 Ky., 759, we on this subject said:

"That such (punitive) damages may be awarded where the negligence is gross is no longer an open question in this State. It has been so repeatedly declared as the law by this court, and is so well known to the bench and bar, that citation of authority would needlessly incumber the opinion. It is equally as well settled that

such damages may, in proper states of case, be allowed for acts of omission as well as acts of commission, for the failure to perform a manifest duty, as well as for the negligent performance of an act that involves a breach of duty, and also that it is a proper element of damage in actions against corporations for the acts of their agents, as well as in actions against persons. And it is generally considered, by courts and text-book writers, that punitive damages are awarded as a civil punishment inflicted upon the wrongdoer, rather than as indemnity to the injured party, although, as he will be the beneficiary of the punishment inflicted, it might with much propriety be said that they are allowed by way of remuneration for the aggravated wrong done. Chiles v. Drake, 2 Met., 146; Milwaukee & St. P. Ry. Co. v. Arms, 91 U. S., 489; Lake Shore & M. S. Ry. Co. v. Prentice, 147 U. S., 101; Sutherland on Damages, sections 391-3; Sedgwick on Measure of Damages, sections 347, 388; Doerhoefer v. Shewmaker, 123 Ky., 646.''

As there was in this case evidence from which the jury might reasonably have concluded that the failure of appellant's servants in charge of the train to properly slacken its speed and give the customary signals in approaching the crossing in the city of Mayfield manifested on their part a reckless and wilful disregard of human life, resulting in the death of the decedent, they had the right to award appellee exemplary damages. So it was not error for the court to instruct the jury that they might award exemplary damages in addition to reasonable compensation if, in their discretion, the evidence showed appellant's train servants to have been guilty of gross negligence in the matter of causing the decedent's death.

Appellant did not, as it might have done, ask that the jury, in the event they allowed appellee exemplary damages, be required to say in the verdict what part of the sum awarded was compensatory and what part exemplary damages, nor does it appear from the language of the verdict that any part of it is exemplary damages. We are not prepared to say that the $9,000.00 allowed will more than reasonably compensate the decedent's estate for the loss of his life, for, according to the evidence, he was but twenty-five years of age at the time of his death, in excellent health and a man of industry and of exemplary character. According to the mortality tables he had an expectancy of thirty-nine years of life,

and though it was shown by the evidence that he was earning only about eight dollars per week at the time of his death, it was further made to appear that during the summer his earnings were greater, and that taking one year with another they would average at least $600.00 per year. In view of the foregoing facts there is no ground for appellant's complaint that the verdict is excessive.

Another ground of complaint urged by appellant is that the trial court erred in excluding from the jury the testimony of M. C. Payne, its attorney and claim agent, as to a question propounded by him to the flagman, Martin Irvin, directly after the death of the decedent, and Irvin's answer to the question. It appears from the bill of evidence that Payne was on the train by which the decedent was killed, and that after it stopped at the station he stepped off of a sleeper attached to the train and going to where Irvin stood at the crossing, had with him the conversation in question. It appears from the avowal of Payne in the bill of evidence that he would, if permitted by the court, have said: "I asked Martin Irvin how it occurred and he said that the man come trotting down upon him and run upon the track immediately in front of the engine." It is insisted for appellant that this testimony was competent as a part of the *res gestae*.

Declarations admissible as part of the *res gestae* must, as a general rule, be made by one of the actors in the affair, contemporaneous in point of time with the particular transaction, at or near to the place of its occurrence, and must explain the main fact; but a declaration so far removed in point of time from the main fact as to make it a mere narrative of a past transaction or a declaration, which does not explain the principal fact, or which was made at some distance from the place of its occurrence is not admissible as substantive evidence as a part of the *res gestae*. Greenleaf on Evidence, section 107; Elliott on Evidence, Vol. 1, Section 542; McLeod v. Ginther, 80 Ky., 399; I. C. R. Co. v. Houchins, 31 R., 93; L. & N. R. Co. v. Ellis, 97 Ky., 330; L. & N. R. Co. v. Molloy, 122 Ky., 219.

While, according to the further testimony of Payne, his conversation with Irvin occurred quickly after the stopping of the train, we are left in doubt as to whether it was near enough in point of time to the main transaction, viz.: the decedent's death, as to make it competent as a part of the *res gestae*, and are inclined to re-

gard it as a mere narrative of the accident resulting in the death of the decedent, made by an actor therein with a view of exonerating himself from whatever blame might be laid at the door of himself or employer for the death of the decedent. In this view of the matter we are unwilling to hold that the exclusion of the testimony was error. Moreover, if we were convinced of its competency, the error of the court in excluding it from the jury would not authorize a reversal of the judgment appealed from, as in our opinion the appellant could not have been prejudiced by its exclusion, in view of the fact that in giving his testimony to the jury Irvin made the same statement attributed to him by Payne.

It is further complained by appellant that the court erred in refusing to its witness, Dr. J. L. Dismukes, the right to testify as to certain substantive facts set forth in an avowal contained in the bill of evidence. It appears from the record that this witness was not permitted to testify because after being sworn and put under the rule with other witnesses before the introduction of any of the evidence, he nevertheless remained in the court room during the trial and while other witnesses were testifying. Whether a witness who has remained in the court room during the hearing of evidence, notwithstanding an order from the court excluding all the witnesses after being sworn, shall be permitted to testify, is a matter resting in the sound discretion of the court, and unless it is made to appear that this discretion has been abused it will not be interfered with. Johnson v. Clem, 82 Ky., 84; Ky. Union Lbr. Co. v. Abner, 17 R., 401. No abuse of such discretion has been shown in this case. On the contrary, the fact that one of the appellee's witnesses was excluded from testifying on the same ground shows that the court in excluding both witnesses was impartially seeking to enforce its rule and protect its dignity.

Finally, it is insisted for appellant that the refusal of the trial court to transfer this case to the United States District Court for the Western District of Kentucky, constituted prejudicial error, entitling it to a reversal. The transfer of the case was first sought by petition and tender of a sufficient bond, before appellant filed its answer to the merits, and again following the return of the jury's verdict which made no finding for or against the defendant, Martin Irvin, and the rendering of a judgment dismissing the petition as to Irvin; the

renewal of the application being made by offering to refile its petition and bond therefor, but the transfer was in each instance refused by the court. The petition sought to remove the case on the grounds of diverse citizenship and the alleged joinder by the appellee of the flagman, Martin Irvin, as a co-defendant with appellant in her action for the alleged fraudulent purpose of defeating the jurisdiction of the United States District Court and depriving appellant of its legal right to a trial in that court as guaranteed by the Constitution and laws of the United States to it as a non-resident of this State, and it is argued by its counsel that, though the trial court may not have erred in refusing the removal at the time of the first filing of its petition and bond therefor, it certainly did so on the second application for the removal, because appellee had then failed to make out a case against Irvin, the resident defendant, which conclusively established appellant's right to the removal.

The radical error underlying this contention is the assumption that the failure of the appellee to recover a verdict and judgment against Irvin sustained the allegation of the petition for removal that he was made a defendant to the action for the fraudulent purpose of ousting the United States District Court of its jurisdiction. As said in B'dway Coal Mining Co. v. Robinson, 150 Ky., 707:

"It is a well settled rule of law that the motive of a litigant can not affect his legal rights, since his rights are to be determined by the facts and the law, regardless of his good or bad motive in asserting them."

Nor does it follow that the failure of the jury to return a verdict against Irvin manifests the bad faith of the appellee in making him a co-defendant with appellant in the action to recover damages for the death of her decedent. It must be conceded that the failure of the jury to return a verdict against Irvin is conclusive as to his non-liability for the death, but it does not show that the appellee did not in good faith believe him equally responsible with the appellant for the death of the decedent. Indeed, there was evidence tending to establish Irvin's negligence, as well as that of appellant's trainmen, and the fact that the jury regarded the evidence insufficient to fix responsibility upon Irvin for the decedent's death, or disregarded it altogether, can not be said to illustrate or affect the motive of the appel-

lee in making him a party to the action. Nor can it be said that the verdict is inconsistent in that it found against appellant and in favor if Irvin. As further said in the opinion of Broadway Coal Mining Co. v. Robinson, *supra*.

"This question has been before this court in the case of I. C. R. R. Co. v. Murphy, 123 Ky., 787, and in the later case of C. & O. Ry. Co. v. Booth, 149 Ky., 245. In the Booth case the court passed the question and determined, that since the negligence in that case might have been due to some other agent than the engineer, who was joined as a defendant, the principle contended for had no application. But, in the Murphy case, the question was squarely presented and decided. Appellant contends, however, that since the verdict in the Murphy case was merely silent as to the servant, who had been joined as defendant, the ruling in that case is not controlling here, where there was an express finding for the servants, Jones and Chumbley. It is apparent, however, that the failure to find for or against the individual defendants in the Murphy case was treated as equivalent to a finding in their favor; and, that being true, the principle of that case is controlling here. In the Murphy case we disposed of the question in the following language:

" 'We can think of cases where possibly the engineer ought to be held to the stricter account, and *vice versa*, but let that be as it may, if the plaintiff is entitled to his verdict against two tort feasors, but the jury are able to agree only as to one of them, and gives a verdict accordingly, we know of no law that prevents the plaintiff from having at least what the jury has given him. If he failed to get the verdict against another also liable, the plaintiff may be aggrieved, but not the defendant.' "

In Stevenson v. I. C. R. Co., 192 Fed., 965, the court said:

"If in any case joint negligence is in good faith asserted, and if in like good faith relief be claimed thereon in the plaintiff's petition, then in recent years there has been no dispute that the joinder of defendant with non-resident defendants was efficient to prevent a removal."

A more recent announcement of the doctrine in question will be found in C. & O. Ry. v. Banks, 144 Ky., 137, in the opinion of which it is said:

"But, in an effort to put at rest any doubt as to the position of this court upon questions like the one presented in this case, we hold: * * * (3) If the State Court upon the filing of the petition for removal alone, or accompanied with affidavits, declines to order a removal, and the case goes to trial, the non-resident defendant may upon the conclusion of the evidence for the plaintiff or after all the evidence is in again move the court for a removal; and if, upon hearing the plaintiff's evidence, or all the evidence, the State Court is of the opinion that there was a fraudulent joinder, and that the plaintiff did not in good faith have any reason to believe when he filed his petition that he could make out a case against the resident defendants, the action should be removed; otherwise not. * * * From what we have said, it follows that the court did not err in refusing to remove the case when the petition for removal was filed, as upon the averments of the petition a cause of action was stated that could not have been brought in the Federal Court, as the Federal Court has not jurisdiction of an action like this between resident parties or an action in which one of the defendants jointly sued is a resident. Nor did the court err in refusing a transfer on the motion made for that purpose after the evidence was in, as the record as then made up did not show that the plaintiff when the suit was filed did not in good faith have reason to believe that an action could be maintained against both the engineer and fireman. On the contrary, we are of the opinion that the evidence made out a case of actionable negligence against the fireman, and that the court should not have directed a verdict in his favor."

Being convinced that the failure of the jury to return a verdict against the defendant Irvin placed the appellant in no better attitude for then demanding a removal of the case to the United States District Court than it occupied upon the filing of its petition for such removal, it follows that the refusal of the court below to grant the removal on either application was not error.

No legal cause being shown for the reversal asked by appellant, the judgment is affirmed.