# Chesapeake & Ohio Railway Company et al. v. Carter's Administrator.

(Decided March 25, 1932.)

BROWNING & DAVIS, KIRK, KIRK & WELLS and COMBS & COMBS for appellants.

J. C. HOPKINS and CHILDERS & BOWLES for appellee.

OPINION OF THE COURT BY HOBSON, COMMISSIONER—Reversing.

Marley Elden Carter, a child two years and three months old, was killed by a train on the Chesapeake & Ohio Railway, and this action was brought by the administrator to recover for his death. On the trial of the case there was a verdict and judgment in favor of the plaintiff for $7,000. The defendant appeals.

The child with his father and mother was at the house of his grandfather Lewis Stratton, which is situated 300 feet from the track of the railway company and about 2 miles from the nearest station. The child was killed by a freight train running from Ashland to Elkhorn City and containing 119 empty coal cars. The child was killed about 10:30 a. m. on December 31. There was a fence separating the railway right of way from the grandfather's property, but steps had been constructed over this fence. The child's father was cutting wood behind the house. The child came out where its father was and he picked him up and set him on the porch of the smokehouse. His wife came out then and the child followed his wife. He didn't see him any more and thought that he had gone in the house. Some ten to twenty-five minutes later he heard the train give a jam and his wife asked where the child was. The grandfather ran out to the track and found the child dead on the left side of the track. According to the proof for the plaintiff, the engine ran 1,200 feet beyond the point where the child was struck before it stopped. According to the proof for the defendant, it ran 20 or 25 car lengths after the brakes were applied before it was stopped, a car length being 35 or 40 feet.

Appellant earnestly insists that under the proof the court should have instructed the jury peremptorily to find for it. The plaintiff's proof was this: Albert Stratton testified that he and several other young men were standing on the side of the railroad track below where the child was killed, hoping to get a ride up to the next station; that the train picked up just as it passed them and they didn't get the ride. When the train stopped they went up to it. This was eight or ten minutes after the accident, and he then met the engineer and brakeman and this occurred: "I said, 'Who in the hell would kill that baby?' The engineer said he didn't know it was a baby; said he thought it was a dog until he got up so close he couldn't stop." Elizabeth Jarrell, who lived not far from where the engine stopped, testified that when the train stopped she heard the engineer say this in her presence to John Harris: "He said the fireman called to me and told me it was a child, and I said, 'No it is a dog, and when we got a little closer the fireman called again and said 'it's a child I saw it raise up' and I said 'no it is a damn dog and I am going to give it all the power I have got.'" Cecil Conley, who was stealing a

ride on the train and was 8 or 10 car lengths back from the engine, gave this testimony:

"Q. Did you see anything on the track, before the child was picked up? A. When the kid was walking up the track, or by the track or near the track, looked like it was going up the railroad track, the left hand side, at that time the engine covered up the kid, I didn't know whether it was a dog or hog, cinders were blowing back in my eyes, I couldn't tell what it was. I never knew what was killed till we got to Harold.

"Q. Did you observe any change in the speed of the train where the child was struck? A. Down the road about a mile probably a mile and a fourth the train whistled and slowed up, then it began to pick up speed again and I couldn't tell any change until it got in 275 or 300 feet of where the child was supposed to have been killed the cars coupled above and the train jammed, they applied the brakes, after the applying of the brakes the whistle blowed. . . .

"Q. How long did you see the child before it was struck? A. I wouldn't say, might have been a thought, maybe a minute.

"Q. Was it on or off the track? A. By the track, probably on the end of the ties, maybe in the path or ballast, appeared to be going up the railroad track, it was moving, I didn't figure it was a kid; when the train run on above the Stratton place, the train went on above there, and pulled me about where the kid was hurt, maybe a car above; the train began to jam, I was sitting on a car one leg hanging over the car, it kind of shoved me over, then after that the train stopped gradually."

On the other hand, the engineer testified that he had no talk with Albert Stratton or with John Harris or in the presence of Mrs. Jarrell, and he introduced another witness who tended to sustain him in this matter. He and the fireman both in substance testified that when they were 4 or 5 car lengths from the child and running 25 or 30 miles an hour, the fireman said that something was on the track. The engineer looked and saw nothing. The fireman then raised up and said it was a child. They were then within about 200 feet of the child. The engineer applied the emergency brakes, blew the whistle, and the train was stopped as quickly as it could be done.

Under the defendant's proof the train could not have been stopped before it struck the child if the brakes had been applied when the fireman first saw the object on the track. On the other hand, there was proof for the plaintiff, by two engineers who had run on the road in 1922, that the train could have been stopped in this distance. But the undisputed evidence for the defendant was to the effect that the engines and cars since 1922 have been made much heavier and that a train, such as this was, would take twice as much space to stop as was necessary for the trains in use in 1922. As there is some difference in the briefs as to the fireman's testimony, we quote it, on cross-examination, as follows:

"Q. I believe you stated on direct examination you looked out and saw the object ahead? A. Yes, sir.

"Q. Then what did you do? A. I looked again after I got closer.

"Q. You didn't continue to look after you first saw it? A. I didn't see it right plain.

"Q. After you first looked out and saw it, what did you do? A. I don't recall what I did.

"Q. Did you fire the engine? A. Fired the stoker.

"Q. Did you perform any duties in the nature of running the engine? A. No, sir.

"Q. After you first looked out and saw the object ahead tell the jury what you did from then on? A. I kept a watch out and looked at it till it was plain enough I could see what it was.

"Q. Didn't you tell the jury a while ago that later you looked out again? A. I got farther out the window.

"Q. How much later was it when you got farther out of the window? A. Two seconds.

"Q. How far had the train travelled in that two seconds? A. About 250 feet."

The rule is well settled as follows: "Neither an infant under three years old nor an idiot can be held liable for a trespass or charged with contributory negligence. If either of them strays on the premises of another, no blame attaches to him; but if, while there, and at a place where the presence of strangers is not anticipated, he gets hurt, the owner of the premises is

not responsible for his injury, when he does not know of his danger in time to avoid it by the exercise of ordinary care after his peril is discovered." Louisville & N. R. Co. v. Logsdon's Admr., 118 Ky. 600, 81 S. W. 657, 658, 26 Ky. Law Rep. 457. To the same effect, see McKnight v. L. & N. R. Co., 168 Ky. 86, 181 S. W. 947; Chesapeake & O. R. Co. v. Price, 179 Ky. 532, 200 S. W. 927; Lee's Admr. v. Hines, Director General, etc., 202 Ky. 240, 259 S. W. 338, and cases cited.

While there was proof for the plaintiff that persons walked along the railroad track at this place and that this was often done, it was two miles from the nearest station, out in the open country, and was not a place where those in charge of the train were required to be on the outlook for trespassers or to limit the speed of the train.

The contrary rule was not laid down in Wimsatt's Admx. v. L. & N. R. Co., 235 Ky. 405, 31 S. W. (2d) 729, 733. In that case there was, as in the other cases cited, proof showing that in the exercise of ordinary care the fireman should have known it was a human being. The court thus stated the rule on such proof:

"The rule is deductible from the cases cited that a railroad company owes no duty to a trespasser lying upon its tracks until the discovery of the peril of the trespasser by those in charge of the train, and that, after the discovery of the peril, the railroad company, through its agents and servants, owes to the trespasser the same duty that it owes to one lawfully on its tracks, and that means that it must exercise ordinary care to avoid the injury after the discovery of the peril. It is not left alone to the statements of those in charge of the train on the question of the discovery of the peril. Facts and circumstances, as well as direct evidence, may contradict the statement of those in charge of the train that they did not discover the trespasser in time to avoid the injury, and, in every case where facts and circumstances render the evidence conflicting, it is a question for the jury to determine whether the peril of the trespasser was discovered in time to avoid the injury by the exercise of ordinary care. It is not required of those in charge of a railroad train that they slacken the speed of the train upon the discovery of some object on or near the track.

not known to be a human being, but, upon the discovery of such an object, the trainmen should observe it from the time of the discovery until they may, in the exercise of ordinary care, determine whether it is a human being.''

The proof is undisputed that the train was about 500 feet from the child when the fireman saw some object on the track, and said so to the engineer. The fireman did not know what the object was until, as he says, two seconds later the child raised up, and he then saw what it was and told the engineer, who immediately put on the emergency brakes and did all he could to stop the train. This was about 200 feet from where the child was killed. According to the proof for the plaintiff the train ran 1,200 feet beyond the point where the child was before it stopped. This added to the 200 feet would make 1,400 feet. According to the proof for the defendant the train stopped within 20 or 25 car lengths after the brakes were applied, and this would be from 800 to a thousand feet. If the brakes had been applied when the fireman first saw the object, clearly under the proof for the plaintiff as well as the proof for the defendant, the train would not have stopped until long after the child was hit. In fact, the fireman's statement as to what occurred is not only not contradicted by the witness Cecil Conley, but his testimony confirms rather the testimony of the fireman, for he says he didn't know what the object was and couldn't tell what it was although he saw it on the side of the track. There is no evidence in the case of any facts tending to show that the fireman should have known what the object was before the child raised up. There being no showing that anything was not done that should have been done, the distance in which the stop was actually made is the best evidence as to the distance in which the train could have been stopped. The engineer makes this statement, uncontradicted:

"When you put the emergency on there is slack in these cars, in 119 cars I guess there is about four car lengths of slack in that train, when you put the emergency brake on the engine is heavy and it goes on the engine first and makes a sudden slack or noise.''

The testimony of the experts introduced by the plaintiff was based on the trains as they knew them in 1922,

and this evidence does not contradict the physical fact as to the distance that this train ran after the brakes were applied. On the facts the court should have instructed the jury peremptorily to find for the defendant. The defendants owed the infant no duty until his presence on the track was discovered, and then they were only required to use proper care in the exercise of the means they had at hand to avoid injury to him. The facts show that the injury to the child was then unavoidable by the use of the means at hand.

Mrs. Jarrell is very indefinite as to when the conversation between the engineer and John Harris occurred. She says it was within thirty minutes after the child was struck, but she also says the engineer was then on the engine. The proof shows that when he stopped the train the engineer, to learn the facts, at once went back about half the distance to where the child was hit and after meeting the brakeman, who told him what had happened, went back to the engine. It would seem that the conversation she refers to took place after this, for the engineer did not know until then what had happened. What he said was competent against him though not part of the res gestae, but it was not competent against the company unless it was part of the res gestae. In Illinois C. R. Co. v. Outland, 160 Ky. 725, 170 S. W. 48, 53, the court thus stated the rule:

"Declarations admissible as part of the res gestæ, must, as a general rule, be made by one of the actors in the affair, contemporaneous in point of time with the particular transaction, at or near to the place of its occurrence, and must explain the main fact; but a declaration so far removed in point of time from the main fact as to make it a mere narrative of a past transaction or a declaration, which does not explain the principal fact, or which was made at some distance from the place of its occurrence, is not admissible as substantive evidence as a part of the res gestæ." To the same effect see Early v. Louisville, H. & St. L. R. Co., 115 Ky. 13, 72 S. W. 348, 24 Ky. Law Rep. 1807.

The rule is that "a declaration made or an act done after the happening of the principal fact may be admissible as part of the res gestæ when it is so intimately interwoven with the principal fact by the surrounding circumstances as to raise a reasonable presumption that

it was made or done under the immediate influence of the principal transaction or event itself and is the spontaneous utterance or expression of thoughts created by, and springing out of, the transaction itself.'' 22 C. J., p. 1455, sec. 545. See, also, 1 Greenleaf on Evidence, 110. Under this rule, without more definite proof as to when or under what circumstances the statement was made, the objections of the railway company to this evidence should have been sustained.

Judgment reversed, and cause remanded for a new trial and further proceedings consistent herewith.