CASE 49—ACTION BY HARRY HARROD'S ADMINISTRATOR
AGAINST THE CINCINNATI, NEW ORLEANS AND
TEXAS PACFIC RAILWAY COMPANY, TO RE-
COVER DAMAGES FOR NEGLIGENTLY CAUSING
THE DEATH OF PLAINTIFF'S INTESTATE.—Jan-
uary 13, 1909.

# Cin., N. O. & T. P. Ry. Co. v. Harrod's Admr

Appeal from Scott Circuit Court.

R. L. STOUT, Circuit Judge.

From a judgment for plaintiff defendant appeals,
and from an order setting aside a former verdict and
granting a new trial, plaintiff took a cross appeal.
Order granting a new trial affirmed and judgment for
plaintiffs reversed.

1. Railroads — Operation—Crossings — Crossing Signals—Persons
Entitled to Benefit.—Railroad crossing signals are given for
the benefit of the users of the crossing, and not for the benefit
of persons on the train or elsewhere than at the crossing.

2. Evidence—Judicial Notice—Conduct of Occupation—Railroads.
—The Court of appeals will take judicial notice that more
passengers and licensees frequent railroad stations in large
cities than in small towns.

3. Negligence—Definition.—"Negligence" is the failure, by omis-
sion or acts of commission, to discharge a duty, so that, if
there is no duty, there cannot be actionable negligence, and
an act may be negligent as to one person and innocuous as to
another.

4. Railroads—Operation—Injuries to Person on Track—Station
Signals.—The statute does not require signals by whistle to
be given on approaching stations, and such signals, when
given, are generally to notify passengers and station and
train employes of the train's approach, and, when it is a duty
at all to give such signals, the duty is only to those en-
titled to notice of its approach, so that, there being no duty
to a yard switchman of another railroad working 500 feet
from the station to whistle for the station, the failure to do
so would not be negligence as to him.

5. Railroads—Operation—Injuries on Track — Signals— Persons
Entitled.—The operators of a through passenger train, having

notice that freight crews of their own and other roads were working in a yard, must keep a lookout for them, and give warning of the train's approach, but the ringing of the bell would be sufficient, and it was not necessary to continuously whistle while passing through the yards.

6. Appeal and Error—Review—Direction of Verdict.—In determining whether a verdict should have been directed for defendant, the evidence must be considered in the light most favorable to plaintiff.

7. Master and Servant—Servant's Duties—Duties to Master and Other Employes.—The common law makes a distinction between passengers or third persons and employes; the latter being required to be familiar with the conditions of their work and to be alert and attentive both for their own safety and to discharge the company's duty toward other employes, so that a trainman should know the time of arrival of all regular trains at all the stations and the rights of the respective trains to the right of way, and the trainmen on a through train could assume that other employes would perform their duties, and give it the right of way, as well as keep out of its way.

8. Railroads—Injuries to Person on Track—Negligence.—Where a yard brakeman, working for another road in yards used by defendant and other roads, knew that defendant's fast train was due at a certain time, he could not rely upon any duty of defendant to the public to slacken its speed while running through the city; and running the train at a high rate of speed through the yards was not negligence as to such brakeman.

9. Railroads—Injuries to Person on Track—Negligence.—Where a yard brakeman working for another road knew that defendant's fast train was due at a certain time, and at the time it was due stepped, without looking, from a safe place between the tracks upon the track upon which defendant's train was approaching, he was negligent as a matter of law, so as to bar recovery for his death.

10. Negligence—Trial—Taking Question from Jury.—Where the facts establish negligence beyond question, so that reasonable minds could not disagree as to its existence, its legal effect is purely a question of law.

BRADLEY & BRADLEY and GALVIN & GALVIN for appellant.

B. F. PROCTER, G. H. HERDMAN and R. L. GREENE for appellee.

(No briefs—Record out of clerk's office.)

OPINION OF THE COURT BY JUDGE O'REAR.

Harry Harrod was a brakeman in the employ of the Southern Railway Company. The latter company and appellant railway company use the same yard tracks for switching at Georgetown. In the month of February, 1904, early in the morning, about 6 o'clock, Harrod and others of the crew in charge of a Southern train were shifting cars on these tracks at Georgetown, in which they had occasion to use the main track of the appellant road. There was a through passenger train due on appellant's road passing from the south through Georgetown at 6:19 a. m. It was known as No. 4. For that train Georgetown was a flag station at which the train did not stop, unless it was signaled to do so for accommodation of through passengers to or from that point. On this morning in question that train was behind time. Harrod was sent to the station to learn what time it would be due in order that he and others of his crew might govern their actions by the information, so as to keep out of the way. He returned, and reported that it was 30 minutes late; that it would go through Georgetown at 6:50 a. m. His crew then went ahead with their work, clearing appellant's main track some minutes prior to 6:50 a. m., so as to leave that track free for the passenger train. But they had other switching to do in its immediate vicinity, which they proceeded with. Harrod was operating the switch, and giving signals to the engine man of his train as to its movements. The switch was on a track parallel to appellant's main track and some nine feet distant from it. The siding on which defendant's train was operating in part had a curve, so that the engineer in charge of his engine when it was some distance to the south could not easily see one giving the signal from the switch if given

on the east side of the track, but could have seen if
given from the west side—the one on which the switch
standard and lever were located. Harrod's engine
then had some four or five freight cars coupled to it,
and he was in the act of causing a running switch, call-
ed "kicking" the car, to be executed. The bell of the
engine was ringing, and the engine was also "popping
off" steam. Of course, there were other usual noises
incident to switching freight cars. The morning was
very cold, though clear, and there was a southwest
wind blowing. Harrod had his cap pulled down over
his ears to protect them from the cold. He had had
about four years' experience as a freight brakeman.
When he had thrown the switch after the engine
and cut-off cars passed over it leading south, he step-
ped across from behind the passing cars, "cut" the
car that was to be kicked onto a siding, and then
crossed on east onto the main track of the appellant
road, where presumably he intended giving his engi-
neer an appropriate signal for his next movement.
At this instant No. 4, running at a high rate of speed,
passed upon the main track, going north. It was pre-
cisely 6:50 of the clock a. m. Harrod was struck by
it and instantly killed. This suit was brought by his
administrator to recover damages for the destruc-
tion of his life, in which it is charged that his death
was caused by the negligence of those in charge of
train No. 4, in that they failed to give proper signals
of its approach, and ran it at too high a rate of speed
to be consistent with the safety of those rightfully
upon the tracks at that point. There were two trials.
The first resulted in a verdict for appellee for $20,000
damages. That verdict was set aside by the trial
court on the ground that it was excessive. The next
resulted in a verdict for appellee for $5,000 dam-

ages. From the judgment upon the latter verdict this appeal is prosecuted, while appellee prosecutes a cross-appeal to have the action of the trial court reversed in setting aside the first verdict and judgment.

The first question is: Should there have been a peremptory instruction, upon appellant's motion, to find for it? Harrod was rightfully using the tracks of the yard at Georgetown. He had the same right there, and was, we apprehend, under the same obligations as to when and how he should use them as if in appellant's employ. A great deal of the evidence admitted bore upon the situation of certain crossings in the vicinity of the accident, and of the population of Georgetown, the location of the depots, and so forth. The theory of appellee's case was that, if the situation was such as required certain signals of warning to be given by moving trains at or near that point, appellee's intestate was entitled to rely upon their being given, and, if they were not given, it was negligence as to him. In addition, and in the same line, appellee contends that the situation required a modified rate of speed to be maintained at or near that point by passing trains, so as to avoid injuring people who had a right to be at or near that point on the appellant's tracks, and whose presence therefore must have been anticipated and provided against. Further stating the facts so as to get at the exact question here presented: The main track which No. 4 was using, coming from the south, was for nearly half a mile south of the Georgetown station, perfectly straight, and nearly level, though for most of the way it passed through a cut. Harrod was killed about 500 feet south of the passenger station. Immediately south of the passenger station, or say 450 feet north of where Harrod was struck, was appellant's freight

depot, which is on the opposite side of the track from the passenger station. There is a much used passway across to the freight depot and stockpens. About 1,100 feet south of where Harrod was struck is a turnpike crossing, known as the Lemon's Mill pike crossing, which is just outside the corporate limits. Just south of that crossing, and on or near a curve in the main line, is the whistling post for Georgetown station. There are no houses between where Harrod was struck and the Lemon's Mill pike crossing. Much evidence was introduced as to the extent of the public's use of the Lemon's Mill pike crossing, and of the one at the freight depot. There was also evidence submitted that Georgetown had a population of 3,500, and a suburb to the north had a population of 500. All of this, as has been said, was to fasten upon appellant the duty of regulating the speed of its trains and giving warning signals at these points.

Railroad owners may be, and in many instances are, under entirely different standards of duty toward their own employes and the public. This difference is not based at all upon any different regard of the law for these two sets of people; for in the eyes of the law the lives and safety of one is as much desired as the other. But the difference rests upon a sound distinction. In the one case there is no assumption of risks—there is no consideration for any. In the other there is. Not that the latter bargain away their safety at all, but they know that the very work about which they are engaged is inherently hazardous, and as ordinarily conducted, even with the best of appliances, is fraught with great and imminent danger to life. They know better than anybody else the necessity for keeping in safe places where such are provided, so that passing trains cannot injure them. They know the custom of railroads in

running their trains at high rate of speed—that speed is the very essence of successful railroading, its maximum rate regulated principally, if not almost entirely, as to the safety of the train and its occupants. They know this is especially true of through passenger trains. They know it as a fact, so general as to be almost universal. The railroad operative has an option whether he will engage in that service. The public have little or no option as to what highways they must travel. The public policy has been and is to require railroad companies to give certain warning signals at the highway crossings. Why? In order to apprise travelers upon the highways about to use the crossing that the railroad train was approaching and about to pass over it, so that the former might, as they probably could, by stopping their vehicles, keep out of the way of the train, or, if pedestrains, keep off the track while the train was passing. As trains running at a high rate of speed cannot stop so easily, and cannot turn out of the way at all, the warning is to the users of the highway, so that the train can have a clear and unobstructed passage over the crossing. This warning, then, is not for the benefit of those on the train or elsewhere than at the railway highway crossing. There is no statute requiring warning signals to be given at stations. They are given, however. But for whose benefit? In the first place, we apprehend, it is to notify the station agent, or dispatcher, or switchman, or whoever is required to take notice of the fact of the train's arrival. In large cities, where the passenger station may be miles from the corporate limits, trains do not whistle for the station to notify passengers, or others there or nearby, that the train is coming. If such duty was imposed at all, it would seem to be more

imperatively required in populous than in sparsely
settled communities, as we take notice that there
are more passengers and licensees frequenting the
stations in the former than in the latter. In the next
place, it may be assumed, though not with as much
assurance, that the signal—that is, the blowing of the
whistle—is to notify passengers who contemplate
taking passage on that train that it is approaching.
But, where there are not passengers to go upon such
train, it is, of course, confined then to the first ground
advanced. Is it for other operatives? Undoubtedly
it is also to apprise conductors of the particular
trains, so that they may cause proper announcement
to be made to their passengers; or, in case of freight
trains, that their crews may be aware, if not other-
wise aware that a station is being approached that
they may take appropriate steps to receive or dis-
charge freight, or take siding to allow the passage
of other trains on the line. But whistling for a sta-
tion, or for a highway crossing, is a duty, where it
is a duty at all, owing to those trainmen and those
members of the public who are entitled to be notified
of that train's approach. Negligence is a failure to
discharge a duty. It may be the omission of a duty,
or doing that which is contrary to a duty. Where,
then, there is not a duty, there is not negligence. An
act may savor of negligence as to one, and be inno-
cuous as to another, because a duty may be owning to
the one, and not to the other. This is familiar in
railroading, as to the duty owing to passengers, and
to servants, which is different in degree; and to
licensees or trespassers, which may not exist at all
till their presence and peril are discovered. If, how-
ever, one class may rely upon the train operatives
discharging their duty properly as to any of the

other classes, and if a failure as to the latter may also be taken advantage of by the former, it would follow that there would be but one standard of duty in such cases, and that would be the highest. But we all know that such is not the law. The failure to whistle for the crossing may have been negligence as to those of the public using the crossing, but for workmen about the yards half a mile away, though they may have come, very naturally, to rely upon it, it was not a duty owing to them, and its omission was not therefore negligence as to them. So the failure to whistle for the station, not being a duty owing to workmen about the yards, was not negligence as to them. We have assumed in this discussion that No. 4 did not whistle at the Lemon's Mill crossing, or for Georgetown station. The decided weight of evidence was that it did whistle for both.

We do not mean to say that the passenger train operatives owed no duty to those rightfully using the yards. We think they did. Having notice that freight crews of their own employer, and of other roads in considerable number did use these yards, they must keep a lookout for them, and must give warning of the approach of the train. They were doing both is the uncontradicted evidence. Those in charge of the engine were keeping a lookout ahead, and the bell of that engine was ringing. It was not reasonable that, in addition, the engine should have kept up a constant or intermittent whistling as it passed through the city. It was not customary; on the contrary, it probably would have constituted a public nuisance by doing so. Besides, if all engines passing through that yard should have kept up such whistling, the din would have resulted, most probably, in defeating the very purpose which it was designed to serve.

As to the rate of speed of train No. 4, there is a sharp conflict in the evidence. That for appellee—some of it—was to the effect that the train was running 50 miles an hour. That for appellant that it was running 20 miles an hour. The trainmen in charge of it insisted that it was running not more than twenty miles an hour, and was under control. As a matter of fact, the train was stopped within a distance of 500 feet after it struck Harrod, using the service brakes only. This would indicate a lower speed than appellee's witness estimated. But we must, for the purposes of this consideration, take the most favorable evidence in appellee's behalf, with the uncontradicted evidence in other particulars, and by them test the rights and duties of the parties. It must therefore be assumed that train No. 4 was running at a high rate of speed, with its bell ringing as a warning to those about the tracks, with a lookout maintained on its engine, and with the train under such control that it could be stopped even with the service brakes, within 500 feet, and with the emergency brakes within much less distance. The track was straight and unobstructed for more than half a mile. There was no question of a highway crossing, or of passengers or licensees at the station. Those matters have no place in this case. The question is simply whether under the circumstances stated that rate of speed was in law negligent as to other trainmen about appellant's yard, and particularly as to the decedent. The common law in particular, being based upon custom, is a practical matter. It is the outgrowth of such common and constant usage as to become a rule of action, proven no less by exceptions than by its universality. Hence it is that the common law recognizes the distinction between what is action-

able negligence toward a passenger or wayfarer and an employe in the line of service charged with the particular duty in question. The latter's business is to be and keep acquainted with the conditions and contrivance in and with which he has to do his work. He must be alert and attentive. He must know a great many things about the matter which the public are not expected or required to know. For example, in a case like the one in hand, he should know the time of arrival of other regular trains on the line of road he is then using—not only for his own safety, but that he may discharge his master's duty intrusted to him as to the safety of those on the other trains. The master, so called, acts through a large corps of such employes. One of them should not let go of his duty to be aware, and thereby impose additional duties on his fellows. Whether he is at a station such as Georgetown or Lexington, or at a mere way station, his duty to know of the movement of other trains due there at that time, and to keep out of the way if they have the right of way over his train, is the same. He cannot say that at Kincaid four or five miles from Georgetown, a mere way station, he owes less duty in that particular than at Georgetown, or that those in charge of trains superior to his owe him a higher duty at Georgetown than at Kincaid. The duties of each toward each other must be the same at whatever point they may be, when they are at the same place. Suppose decedent's train had been at Kincaid, and No. 4 knew of its presence there, and knew that it was likely to be engaged in switching at that moment (but not on the main track), would the duty of those running No. 4 have been different as to the speed of their train than if the same fact had been known by them as to decedent and his train at

Georgetown? Those in charge of No. 4 knew that it was the superior train, having the right of way, and that trains of lower grade on the line must keep aware of its movements in their vicinity, and keep out of its way. Not only keep their trains out of the way, but keep themselves out of its way. They had a right to rely on other trainmen observing their duty in these respects, and to run their own trains accordingly. That is practical railroading, and the only way, it seems to us, that large systems, using many trains and fast trains, may maintain their service. If observed, it is as safe, too, as the nature of that business seems now to admit of. It cannot be made safer by lessening the care of those whose primary duty it is to observe the care.

If Harrod had been a section workman in the yards at Georgetown, his case would not have been less than it is. Sectionmen work in railroad yards, as well as in the country, at all times, and may reasonably be expected there at any time. They must be aware of the time of the running of the trains over the track on which they are at work. Even though those in charge of a fast train knew they were working at that point, or might reasonably be expected to be working there, they also knew it was their duty to maintain a clear track for that train, and to themselves keep out of its way, as they well could. Would the speed of the train, even though negligence to the passengers or licensees, have been negligence as to them? We think not, and it would make no difference whether they were in the yards at Georgetown, at Kincaid, or in the country where there was no station; for it must always be borne in mind that negligence toward a person is the antithesis of a duty owing to that person. But the facts of this case carry

us one step further:   Decedent actually knew that
train No. 4, a fast through passenger train, was due
to pass his point at 6:49.   He obtained the knowledge
for the very purpose of keeping out of its way. When
it came along at the very moment it was due to come
it were as if he had at that moment notice of the fact.
Why do trains whistle and ring their bells?   Obvious-
ly to notify people, whom they owe a duty to, of their
approach.   If, then, the person to be notified already
knows the fact, why again notify him?   L. & N. R. R.
v. vs. Taaffe's Adm'r, 106 Ky. 535, 50 S. W. 850;
Helm vs. L. & N. R. R. Co, 33 S. W. 396, 17 Ky Law
Rep. 1004; Craddock vs. L. & N. R. R. Co., 16 S. W.
125, 13 Ky. Law Rep. 18.   And why are trains re-
quired by the common law to slacken their speed
when passing through populous settlements.   Be-
cause it is far more probable that one or more per-
sons from among so great a number may be, and
probably will be, rightfully using the tracks of the
railroad at that point at that moment unaware of the
train's approach, and, if the too high rate is main-
tained, they will be run over and killed or injured
before they could get out of the way even after learn-
ing that the train was coming  But those who know
that the fast train is due and coming in cannot rely·
upon its duty towards others ignorant of the fact, so
as to charge its operatives with negligence in running
it at high rate of speed, for with their knowledge, by
keeping off the track, the speed of the train would be
harmless to them.   But the facts here carry us still
another step:   Decedent unnecessarily went from a
place of perfect safety to one of great hazard to serve
his own convenience alone, and thereby put himself
in a position where no amount of care in operating
train No. 4 would have saved him.   They could not

see him till he suddenly stepped out on the track immediately in front of their engine. Whether running 20 or 50 miles an hour then, the train could not have been stopped in time to avoid striking him. Between the tracks was a safe place in which to do his work. On the west side it was safer, though not quite so convenient. To step into the middle of the main track, at the moment a fast, heavy train was due, and which he knew was due, without looking, is such an act of negligence that its quality is not debatable. Nor can it be ignored in law. Being established without question, its legal effect is a pure question of law.

From whatever point the facts are viewed, we are unable to say that appellant failed in any duty it owed the decedent. His lamentable death, due no doubt to his aberration of the moment, coupled with the precautions he had taken from the cold, and the usual noises of his own train, drowning to his ears the ringing of the bell on the approaching engine, was not attributable to any want of legal care which the appellant owed to him.

Other questions presented are not passed upon. Being of the opinion that the peremptory instruction should have been awarded upon the appellant's motion, the cross-appeal is affirmed, and the judgment upon the principal appeal is reversed, and cause remanded for a new trial under proceedings not inconristent herewith.      NUNN, J., dissenting.