# CHARLESTON.

WILLIAM DAVID SHIRLEY, *Infant, Etc. v.* NORFOLK & WESTERN RAILWAY COMPANY *et al.*

(No. 6364)

Submitted February 5, 1929. Decided February 12, 1929.

22

*Harman & Howard,* for defendant in error.

*F. M. Rivinus, Strother, Sale, Curd & Tucker* and *Goody-koontz & Slaven,* for plaintiff in error.

LIVELY, JUDGE:

This writ challenges a verdict for $20,000.00 and judgment entered thereon July 7, 1928. The parties will be herein designated as they were in the trial court as plaintiff and defendants, and not as plaintiffs in error and defendant in error. Plaintiff, a boy five years and twenty-five days old at the time of the accident, had his hand mashed by a railroad car or cars operated over a spur, or service track, necessitating amputation at the wrist. The gravamen of negligence charged in the declaration is that defendant permitted a sand pile to remain near its spur track at which plaintiff was playing, and that defendants in shifting the cars by the sand pile negligently and carelessly failed to keep a lookout for him in dangerous proximity to its track, and did not warn him of the approach of the cars, by reason whereof plaintiff was run over and against by said cars and injured. A photostatic copy of a map made from careful survey of the spur track and its immediate surroundings (scale fifty feet to the inch) will visualize the controversy. (See attached map.) The spur track is approximately 1500 feet long and extends from the main tracks a westerly course to the tipple of a coal company. At the sand pile and crossing and between them and the store on the east the track "swagged," that is the grade was lower than at the tipple on the west and the store on the east. On the day of the accident eighteen loaded coal cars were standing in this "swag" just east of the sand pile and west of the store. The sand pile proper was on the coal company's land where it unloaded a car of sand each month for use in its mining operations, but

it appeared from the evidence of plaintiff's father that on the day of the accident the sand was scattered and extended on to the right of way of the railroad and up to the south rail. A shifter entered the spur track for the purpose of first taking out the loaded cars and then putting in empties. The conductor walked along the loaded cars on the north side to get the billing and check the cars and be in position to signal the engine crew, none of which duties could have been performed had he been able to travel on the south side. He states that he then stationed himself opposite the sand pile and in full view thereof and after the brakeman had travelled over the cars to release the brakes and attend to the coupling and air hose (in which the conductor assisted), the cars were pulled east toward the store and away from the sand pile in order to back toward the tipple so that a swing could be given to the loads to haul them out to the main line. The movement necessary was first forward east then back to westward toward the tipple, and then eastward again with a "swing" to get the cars out of the "swag" (depression in grade) on to the main line. The conductor and brakeman both say that when this movement began and when the first car passed the sand pile on the westward movement, no person whatever was on the sand pile. The cars were backed toward the tipple and stopped for three to five minutes in order to give the brakeman time to walk back past the sand pile to the engine where his duties called him to do switching. At some time in the movement of the loads the child's hand was crushed, for the father and perhaps others discovered after the accident blood and small bits of flesh on the south rail at the sand pile. Witness Penman, superintendent of the coal company, who was standing from fifty to seventy-five feet of the sand pile in full view of it also says there was no person on the sand pile when the first car passed it. At what time in the movement of the cars, whether forward or backward or what the child was doing or how it got there is not by any means clear, for no witness saw the accident. The child did not testify being of very tender years, nor did its mother who first discovered it was injured.

The child lived with its parents in a house, the back porch

of which was twelve or fifteen feet south from the sand pile. The theory of plaintiff is that the child was playing on the sand pile with another boy when the cars first passed on their swing westward toward the tipple, and that the conductor and brakeman did not use reasonable precaution to discover the child in dangerous proximity to the track. The argument is that defendants' witnesses, the conductor, brakeman, and Penman, the mine superintendent, were interested, and the jury had the right to disregard their positive testimony that the child was not then there. To sustain his theory that the child was on the sand pile when the movement westward began, plaintiff relies upon the testimony of Vickers, Dominick Paradise and Andy Pivento.

Vickers who lived next door south of plaintiff's house (shown on map) says that he was sitting on his front porch, and in a very short time after the first movement of the train *west* toward the tipple the mother came around her house leading the injured boy and screaming, and he immediately went to her aid. Paradise who lived next door to Vickers (his house is not shown on map) and about forty yards from the track was standing on his front porch, heard the mother screaming, and went to the Vickers house immediately where she and the boy were, and he says that part of the train had then passed the crossing going *east* toward the store; that he went down to the track while the train was passing and tried to tell Penman of the accident, but had to wait until the cars passed in order to get his attention. Penman corroborates him in that particular. Plaintiff's witness Paradise says he came from the store before the engine became coupled to the loads, walked down to the crossing and saw two children on the sand pile five or six feet from the track throwing sand at each other; he then went to his house, the seventh in the row south of plaintiff's home, which he thinks took him about two or three minutes, deposited his parcels of merchandise on the kitchen table and then heard the screaming of the mother. He immediately went to the Vickers' house a short distance away, and the train "it had done gone" up toward the main line. So taking the evidence of plaintiff's witnesses it is very contradictory as to what

time in the movement of the train the accident occurred. In fact the evidence of Paradise and Pivento corroborates defendants' witnesses who say that while the train was moving out to the main line they heard some unusual noise. If the cars remained stationary near the tipple long enough for the brakeman to walk from the rear to the head of the train, estimated at from three to five minutes, a fact uncontradicted, it seems as though the accident with its attending screaming and gathering of people, would have been known before the cars began the final eastward movement to the main line. Plaintiff's counsel, assuming that the evidence established the injury at the time of the first movement east toward the tipple, introduced two witnesses who said they did not observe the brakeman or any one on the first car as it approached the sand pile. Vickers was one, and some other witness at the tipple who could not say at what place in the movement *west* he observed that no one was on the head car. The conductor and brakeman both say the latter was on the front car with his feet in the stirrup and near the air cock in order to stop the train from backing into a car which was standing at the tipple with the drop bottom down.

On this evidence defendant says the clear preponderance is that the child was injured by some car in the train on the eastward movement, and that it was under no duty to police the sides of its cars while in motion to prevent children or other trespassers from climbing on or approaching it in dangerous proximity, and citing *Angeline* v. *Railway Co.*, 99 W. Va. 85. And it is argued that its peremptory instruction refused should have been given. Plaintiff's counsel argue that the child having been seen on the sand pile a short time before the western movement, the presumption is that it remained there and was injured on that movement, and therefore the jury were within their province in finding that defendants' three witnesses who said he was not there then, did not successfully rebut this presumption, and that they could also find that defendants were negligent in not using ordinary care to discover him there; and that he was injured in the first westerly movement, citing *Gunn* v. *Railway Co.*, 42 W. Va. 676; and *Dempsey* v. *Railway Co.*, 69 W. Va. 271.

Without going into the merits of the two contentions, and pointing out the difference in facts between this case and the *Gunn* and *Dempsey* cases, inasmuch as the case must be remanded for another trial when other evidence may be introduced making the case substantially different, we will not now pass upon this alleged preponderance of evidence and the motion to instruct. The case was not very well developed. As above stated, the mother who first discovered the injury was not examined, and it appears that this was the second trial. The other child supposed to have been on the sand pile with plaintiff was not a witness, nor does it appear how old he was, or where he was at the time of the trial. Much of the uncertainty of the whereabouts of the child and its actions may be cleared.

It may be observed in passing that while it is not negligence *per se* to have a sand pile near the track or on its right of way, the conductor knew that children were in the habit of playing there and corresponding precautions should always be taken to discover their presence and prevent injury, consistent with other duties. The conductor says he discharged this duty by placing himself just across the track from the sand pile when the movement began, and remaining there until about half the train had passed on its outward or easterly movement to the main line.

Over the clamant objection and exception of defendant properly preserved, many of plaintiff's witnesses were permitted to state that no whistle or bell was blown or sounded for the crossing. It is reasonably well settled by our decisions that this duty is for the benefit of those who are using the crossing, and it is not a duty owing to those who are trespassing on the track or near the track. *Huff* v. *C. & O. Ry. Co.*, 48 W. Va. 45; *Spicer* v. *C. & O. Ry. Co.*, 34 W. Va. 514; *C. & O. Ry. Co.* v. *Bullington's Admr.*, (Va.) 116 S. E. 237. Plaintiff would justify this evidence as a circumstance which the jury could consider in determining whether defendant was negligent in not discovering the child and preventing injury to it. This is on the theory that because the engineman and employees were negligent in not ringing the bell or blowing the whistle for the crossing, it was a circumstance

which tended to show carelessness in not discharging the other duty of keeping a reasonable lookout for trespassers, or persons in dangerous proximity to the track. This accident occurred in daylight, and all movements of the train were slow. This reasoning is not sound. By the same reasoning any neglect of duty not pertinent to the injury would be admissible. The jury may have concluded that because defendant's servants were negligent in not warning the public at a crossing, granting that a warning was imperative and would be negligence, under the circumstances, as to a person on the crossing, they could infer that defendants were negligent in not keeping a reasonable lookout for trespassers. This evidence was inadmissible and highly prejudicial.

The verdict will, therefore be set aside; the judgment reversed, and a new trial awarded.

*Reversed and remanded.*