# Hensley et al v. Braden.

(Decided Nov. 19, 1935.)

CLEON K. CALVERT, ASHBY M. WARREN, LOW & BRYANT, B. M. LEE and J. C. BAKER for appellant Louisville & Nashville R. Co.

E. H. JOHNSON and MARION THOMAS for appellant Cecil Hensley.

R. L. POPE, R. S. ROSE, J. O. BAKER, EDWARD C. O'REAR and ALLEN PREWITT for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON— Reversing.

This appeal requires a review of the trial of an action to recover damages for personal injury alleged to have resulted from the concurrent negligence of Cecil Hensley, a taxi driver, and the Louisville & Nash-

ville Railroad Company, in which damages in the sum of $10,000 were fixed by the jury's verdict against both defendants with its direction that Hensley "shall pay $3,000 of this sum."

A variety of questions are presented and debated in the briefs and nearly one hundred cases cited to sustain the parties' respective insistence. In the outset, we dsire to announce that we will not review in this opinion àll of the cases cited. To do so would consume too much time and space.

The decisive question to be determined is the right of both Hensley and the railroad company to a directed verdict.

Much evidence was introduced by the parties to prove and disprove that Braden was a licensee as to the railroad company at the time he sustained the injury for which he sues. In disposing of the paramount question, we shall consider that Braden had the right to use the footpath described by the evidence, as a licensee of the railroad company, and was a passenger of Hensley.

To properly consider and dispose of the right of either of them to a peremptory instruction, requires a reproduction of the salient evidence relating to the time, place, and surroundings of the parties immediately preceding and at the time of the accident.

On March 23, 1932, Braden was at the mine of the Creech Coal Company at Lowe, in company with a Mrs. Bussell, his sister-in-law. Around 5 o'clock, on the afternoon of that date they hailed Hensley, a taxi driver, and engaged him to transport them to Banner Fork No. 1, an abandoned coal mine camp in the immediate vicinity of which about forty-two families, composed of from four to eleven members, resided. On entering the taxi, they occupied the rear seat, Braden on the right, and Mrs. Bussell on the left; they began and continued their journey to Banner Fork No. 1. In making the trip, they reached a public crossing at Lisle, which was blocked by the train of coal cars later involved in the accident in which Braden sustained his injury. After waiting a few moments, the crossing was unblocked when the taxi crossed it and proceeded on its way. The highway and the railroad track from

Lisle to Banner Fork No. 1 paralleled each other. While the taxi was traveling from Lisle to Banner Fork No. 1, Braden occupied the side of the seat next to the railroad track. He claims that while so traveling he did not know the train and taxi were traveling in the same direction. At Banner Fork No. 1, the highway skirts the railroad track for a distance of about 184 feet. The metal on the highway extends to the end of the ties, this 184 feet. A public crossing is 416 feet from the place of the accident over which the train traveled before it reached the point at which Braden was injured. On reaching Banner Fork No. 1, 416 feet from the public crossing, Hensley stopped his taxi on the right side of the highway within about 6 inches of the ends of the ties. As to the length of time the taxi stood still on the highway before Braden was injured, the testimony of Braden and Mrs. Bussell is clear and conclusive. In this fact lies the solution of the case. To be accurate, we quote their testimony establishing it decisively.

Braden's language is:

"He (Hensley) drove up to No. 1 and my sister-in-law was opening the pocket-book to pay the fare. I saw she started getting the change out, I opened the door and kinda scooted out, this way, with my right foot, and as I scooted out, the door was about half open. I looked and saw the rails, when I saw the rails I riz to my feet so I could look over the door to see if there was anything on the rail, and the train was in eight feet of me and I tried to make my escape back in, but it was too late to shut the door."

Also, he was asked and answered as follows:

"Q. About how wide do you think you got the door open and saw the train coming? A. About half open, maybe a little more.

"Q. How many feet did you get on the running board? A. I got one foot out on the running board.

"Q. What did you do when you looked out and saw the train bearing down on you? A. I tried to make my escape back in the car. * * *

"Q. How long from the time you saw that train

bearing down on you until it struck the car door? A. About like that (snapping fingers rapidly). * * *

"Q. What did it do to you? A. It run over my left foot and had it busted up until it had to be taken off here."

Mrs. Bussell was asked and answered thuswise:

"Q. What did you do, if anything, when the car stopped? A. I started to pay the fare.

"Q. Your taxi fare? A. Yes Sir.

"Q. Did you see the train hit your brother-in-law? A. Just as I looked around the train hit him.

"Q. Where was he at that time? A. He was just stepping out of the door.

"Q. Did he get plumb out of the car or partly out? A. Partly out. * * *

"Q. What happened to the car when it hit? A. Tore the door from the car. * * *

"Q. After the car stopped, what did you do while Claude was getting out or attempted to get out of the automobile? A. I started to pay the fare.

"Q. Did you get it paid before he was hit or not? A. No Sir, I just started to pay the fare. * * *

"Q. What had you done towards that? A. I got a dime out of my pocket and was getting the other dime out of my pocketbook.

"Q. But hadn't reached it to the taxi driver? A. Started to reach it to him.

"Q. He hadn't taken hold of it? A. No Sir.

"Q. How long had that car stopped to park there before your brother-in-law was struck? A. I don't know."

To obtain a more perfect conception of what transpired at the time Mrs. Bussell was engaged as described in her testimony, we revert to other questions to, and answers of, Braden, which read:

"Q. Is it true or not that Mrs. Bussell and Mr. Hensley were engaged in a conversation about the

payment of the taxi fare and making some change there?  A. Yes Sir.

"Q. While that was going on, what did you do?  A. I opened the door after she opened her pocketbook.

"Q. Had the payment been made and the change transaction completed before you opened the door?  A. Well, I had my head looking off at that time. * * *

"Q. If I understand you, while he was engaged in this transaction with your sister-in-law, you got up from your seat and opened the door next to the railroad track—the train was going towards Wallins at the time—and got one foot out on the running board of the car?  A. Yes Sir.

"Q. What position was your body in when you were there?  A. Well, it was partly in the car and partly out of it.

"Q. How much outside of the door, approximately, at the time you saw the train get in about eight feet of you?  A. There was about half of my body out when I looked and saw the train."

Braden further testified that at the time he was so engaged the paved highway at this point was about 20 or 22 feet wide and no other vehicles were present or passing thereon.

On the opposite side of the railroad track from where the taxi stopped was a footpath leading in the direction of Braden's home.  N. R. Denham, a civil and mining engineer, a witness of Braden, made measurements of the ground and prepared a map showing the public crossing, the railroad track, the public highway, and this footpath.  He located the taxi at the time Braden was injured 10 feet from the point one would travel if crossing the railroad track going to, and using, this footpath.  A sense of fairness to Braden induces us to say that he and others testified that the taxi stopped "directly opposite the path." He asserts the right of a licensee to travel it.

The parties agree that Braden, Mrs. Bussell, and Hensley were perfectly familiar with the highway and railroad track and knew that the metal on the highway

extended within about 6 inches of the ends of the railroad ties for a distance of 184 feet and that taxies and other vehicles generally used this distance along the side of the track when stopping, discharging, and receiving passengers. It was, however, not attempted to be proven that the railroad company, after it passed over the crossing, theretofore had engaged in, or adopted the custom of, giving signals, to warn those about to use the footpath, of the approach of its trains. No depot or flag or other station was kept or maintained by the railroad company at Banner Fork No. 1. The railroad track was used only by coal cars. There is a contrariety of evidence respecting the blowing the whistle and the ringing the bell of the train for, and at, the public crossing. Braden's witnesses testified, and it was admitted by the railroad company, that neither the whistle nor the bell sounded on this occasion after the train passed over the public crossing, 416 feet from the point of the accident. The fireman of the train was in a position he could not see the taxi. The engineer testified that he first saw it when the train was within 100 feet of it, but that at the time Braden opened the door and a portion of his body appeared thereat, the engine was within 15 feet of the taxi, and instantly he applied the emergency brakes with the view of immediately stopping. Other witnesses expressed the opinion that the train was at the public crossing about the time the taxi arrived where Braden attempted to alight.

It is admitted that the taxi stopped with the rear in the direction from which the train was moving and that when Braden opened the door he swung it to his right out into the path of the train; the door was about 2 feet and 10 inches to 3 feet wide, and, after it was opened by him, the front edge of it was in the path of the train when the left side of the passing train struck the door, knocking him from the taxi, seriously injuring his foot and leg. The train was going at the rate of 25 miles per hour.

The right of Hensley to a peremptory instruction must be considered and disposed of on the proven facts and circumstances as they concern him and Braden, which we will undertake to do before considering the right of Braden to recover of the railroad company or determine its liability to him.

It is not disputed that except for Braden's actions in arising from the rear seat of the taxi to his feet, opening the taxi door and commencing to depart from the taxi, the train could, and would, have passed the taxi, without colliding with the door. Braden's actions and conduct were without warning to, or the consent, or knowledge, of Hensley. Also, it is admitted that the taxi, itself, including its door, except for the acts of Braden, was free of fault. Nor is it disputable that the highway opposite the side of the taxi, as well as the condition of the surface on to which he was getting out of the taxi, was a perfectly safe place for discharging Hensley's passengers, but for Braden's opening the door of the taxi out into the path of the approaching train.

Hensley, when stopping the taxi upon the right side of the highway to permit his passengers to alight, was observing and obeying the law of the road, governing the operation of motor vehicles upon a public highway. Section 2739g-35, Kentucky Statutes. And the door of the car, at the time he sustained his injury, was in good condition, and exclusively under the control, and the use, of Braden, and so being used without the invitation or knowledge of Hensley. Chadwick v. Louisville & N. R. Co., 213 Ky. 831, 281 S. W. 1018, 45 A. L. R. 1537. While so using it, Hensley was engaged in collecting of the passengers the charges for transporting them, of which Braden had actual knowledge. Such naturally was a warning to him that Hensley was not only not observing his attempt to get out of the taxi, but was not ready or prepared to invite or assist him in so doing. The dangerous condition which caused Braden's injury was created by, and arose out of, his actions in quickly rising from his seat and suddenly opening the door of the taxi into the path of the approaching train. At that time the presence of the railroad track, its proximity to the taxi, the probability of the train approaching, and the potential danger arising from his opening the door of the taxi were as obvious to him as to Hensley.

It is true that Braden was not bound to anticipate that Hensley had stopped the taxi at a place in which it was dangerous for him to alight. To some extent, but not absolutely, he had the right to rely upon Hensley exercising ordinary care in this respect, to avoid dan-

ger to him while alighting. The extent to which a passenger in such circumstances may rely upon the driver depends in each case upon the particular facts. If Braden had an opportunity to observe or to know of the actual or potential danger attending his alighting on that side of the taxi, or if it were as obvious to him as to Hensley, the duty devolved upon him of pursuing a course or taking measures for his own protection. He was without the right to close his eyes to an obvious danger, or to one as easy to be seen by, or as well known to him as to Hensley, and intrust his safety absolutely to him. While he cannot be held to the same degree of care as Hensley, yet it was his duty to exercise ordinary care for his own safety in alighting from the taxi, which included seeing and hearing that whch an ordinarily prudent person in like or similar circumstances should see and hear.

The obligation resting upon Hensley with respect to Braden while the taxi was stopped for the purpose of his departing from it was to exercise only ordinary care, or care in proportion to the danger likely to be encountered while it was so stopped; to see that the place selected for the discharge of his passngers was safe for that purpose. Cooke v. Elk Coach Line (Del. Super.) 180 A. 782. Though while Braden was being transported over the highway, it was the duty of Hensley to exercise the highest degree of care for Braden's safety and protection. Pere Marquette R. Co. v. Strange, 171 Ind. 160, 84 N. E. 819, 85 N. E. 1026, 20 L. R. A. (N. S.) 1041; Cincinnati, N. O. & T. P. R. Co. v. Giboney, 124 Ky. 806, 100 S. W. 216, 30 Ky. Law Rep. 1005; Payne. v. Simmons, 201 Ky. 33, 255 S. W. 863, 33 A. L. R. 814, and cases cited therein.

Where a passenger is in a position rendering him liable to be injured by a car on an adjacent track, it is the duty of the employee of the carrier who has knowledge of the passenger's position and that he is not obvious of such danger to warn him thereof. Louisville & N. R. Co. v. Rommele, 152 Ky. 719, 154 S. W. 16, Ann. Cas. 1915B, 267; Illinois Cent. R. Co. v. Proctor, 122 Ky. 92, 89 S. W. 714, 28 Ky. Law Rep. 598.

There is no duty, however, to warn a passenger of danger where the conditions which constitute the danger are as observable by, and apparently as obvious to,

him as to the carrier. Chesley's Adm'r v. Waterloo, etc., Co., 188 Iowa, 1004, 176 N. W. 961, 12 A. L. R. 1366; Powers v. Connecticut Co., 82 Conn. 665, 74 A. 931, 26 L. R. A. (N. S.) 405.

The duties of the owner or operator of a taxi to his passengers are distinguishable from those of a commercial railway, in so far as the duty rests upon him to furnish safe passage to and from a car. Cooke v. Elk Coach Line, supra. From the very nature of things, the operator of a taxi cannot discharge those duties with respect to a passenger which the law imposes upon a commercial railway. The owner of a taxi has no control over the public highway or the traffic on it. He has no station or platform and can erect none upon the highway. From the one side of the highway to the other is a public place open to travel to all, and over it the operator of a taxi has no control or jurisdiction. Choquette v. Key System Transit Co., 118 Cal. App. 643, 5 P. (2d) 921. The operator of a taxi who permits a passenger to alight from a car at a place not ordinarily used in discharging passengers and where many vehicles are accustomed to pass is not bound to warn the passenger of the danger of passing traffic nor to protect him from such danger after he has left the car. The fundamental reason of this rule is, the conditions which constitute the danger to the passenger are "as observable by," and "apparently as obvious to, him" as to the owner or operator of the taxi. Smith's Adm'r v. Cincinnati, N. O. & T. P. R. Co., 146 Ky. 568, 142 S. W. 1047, 41 L. R. A. (N. S.) 193; Louisville & N. R. Co. v. Sizemore's Adm'r, 221 Ky. 701, 299 S. W. 573; Malzer v. Koll Transportation Co., 108 N. J. Law, 296, 156 A. 639. Also, see, Cooke v. Elk Coach Line, supra, and Louisville R. Co. v. Breeden, 257 Ky. 95, 77 S. W. (2d) 368.

The proven facts and circumstances, as they concern Braden and Hensley, are not disputed. Hence, Braden's right to recover of Hensley and the latter's liability to the former becomes one of law which is found in the principles herein reiterated.

It is apparent that it is our view that the court improperly overruled the peremptory instruction as to Hensley.

With the developed facts and circumstances here-

inbefore stated in mind, we shall now determine the right of the railroad company to the same instruction.

The duties of a railroad company to one occupying a taxi actually traveling on a paralleling highway and those it owes him as a licensee with the right to travel a footpath over its track are easily differentiated and applied.

On the facts presented, the duties which the railroad company owed Braden were twofold; those owing him as an occupant of a motor vehicle traveling on a public highway paralleling the railroad track, and those due him as a pedestrian with the license to use a footpath across the railroad track.

> "Ordinarily, the railroad company is not under the duty of maintaining a lookout beyond its right of way, or of anticipating that a traveler on the highway alongside the track in proximity thereto, will, without taking any precaution in his own behalf, drive suddenly upon the track."

It owes him the duty to exercise reasonable care to prevent injuring him at a crossing, only after discovering that a traveler in an automobile is about to turn so as to come upon the crossing. 3 Blashfield, sec. 1707, c. 47, p. 63; Stull's Adm'r v. Kentucky T. & T. Co., 172 Ky. 650, 189 S. W. 721, 723; Cincinnati, N. O. & T. P. R. Co. v. Harrod's Adm'r, 132 Ky. 445, 115 S. W. 699; Louisville & N. R. Co. v. Richmond, 202 Ky. 281, 259 S. W. 329, 330; Conway v. Louisville & N. R. Co., 135 Ky. 229, 119 S. W. 206, 122 S. W. 136; Louisville & N. R. Co. v. Condor's Adm'r, 204 Ky. 132, 263 S. W. 705; Louisville & N. R. Co. v. Penrod's Adm'r, 108 Ky. 172, 56 S. W. 1, 22 Ky. Law Rep. 73; Louisville & N. R. Co. v. Jenkins, 168 Ky. 512, 182 S. W. 626; Illinois Cent. R. Co. v. Lashley, Adm'r, 208 Ky. 374, 270 S. W. 806, 807; Shirley v. Norfolk W. R. Co. et al., 107 W. Va 21, 147 S. E. 705, 66 A. L. R. 807.

In the Stull Case, the rule is stated in this language.

> "In no state of case are the ones operating a railroad train required to keep a lookout for persons, except those persons who may be upon the tracks or dangerously near to them. The lookout cannot

be extended to persons who may be travelers upon nearby highways."

In the Richmond Case, we said:

"To extend such duty to persons not using the crossing would include all travelers using parallel highways for an indefinite distance from the crossing and workmen in fields adjacent thereto, and possibly others in the vicinity might claim that their business affairs were regulated on the basis of the law being complied with in the giving of such signals.

"Certainly such was not the intendment of the law, which permits the two classes of highways to parallel each other, and does not require a lookout or signal duty for the benefit of travelers upon the parallel highway when approaching places where the highways are in close proximity, except in cases of discovered peril. The fact that the closeness of the highway is near a public crossing does not change the duty of the railway employees in this respect. Confusion has probably arisen from the fact that we have held that one about to use a crossing may give evidence of his intentions, and as to what course he would have taken if the signals had been given. Conway v. Louisville & N. R. Co., supra. And upon this ground travelers not about to use the crossing undertake to create a liability by showing how they intended to use the highway if signals had been given."

In Illinois Cent. R. Co. v. Lashley, we state:

"It is a well-settled rule of this court that at such places, so used by the public, where the presence of persons on the track is reasonably anticipated, and the track has been so used by the public for a long space of time, a lookout duty is required, and that ordinary care must be used to avoid injuring them."

Payne v. Pritchard's Adm'r, 200 Ky. 397, 255 S. W. 56; Chesapeake & O. R. Co. v. Banks' Adm'r, 144 Ky. 137, 137 S. W. 1066.

A large part of the railroad mileage in this state is skirted on one side or the other by highways with numerous crossings leading therefrom. It is enough to

say without more that if the character of lookout were required as contended for by Braden, simply because the taxi was traveling on the lawful side of a public highway, there would be, in order to avoid possible liability, an intolerable recurrence of giving signals; the throwing on of emergency brakes, and an inadmissible interference with the efficient movement of the commerce of the country. Mobile & O. R. Co. v. Johnson, 157 Miss. 266, 126 So. 827.

Appraising the uncontroverted facts in the light of these principles, since there was no vehicular crossing over the railroad track at or near the place at which Braden was injured, therefore, those in charge of the train did not owe the taxi and its occupants so long as it was moving safely along on the paralleling highway, even lookout duty, nor to exercise ordinary care to avoid injuring it or them, while so traveling on the paralleling highway.

If the taxi occupied by Braden had been on, or approachng near a crossng over which vehicles as licensees of the railroad company had the right to approach and use, then there would have been upon those in charge of the train the duty to keep a lookout and use ordinary care to avoid injuring it and its occupants, which includes the giving of customary and necessary signals for the protection of persons having the right to use such crossing. Lousville & N. R. Co. v. Redmon's Adm'x, 122 Ky. 385, 91 S. W. 722, 28 Ky. Law Rep. 1293; Chesapeake & O. R. Co. v. See's Adm'r, 79 S. W. 252, 25 Ky. Law Rep. 1995. It was, however, not the duty of those in charge of the train to maintain a lookout beyond the right of way and to anticipate that a person traveling in a vehicle in proximity thereto without taking any precaution in his own behalf or the vehicle would leave the highway and enter suddenly upon the track. See cases supra; Georgia Southwestern & G. R. Co. v. Lasseter, 41 Ga. App. 154, 152 S. E. 267.

Until those in charge of the train observed the taxi was not moving and were cognizant of such facts as would apprise a reasonably prudent person under like circumstances that it was at a standstill and would not likely move on, and a passenger therein might depart therefrom with the intention of using the footpath, they

were not required to anticipate the stopping of the taxi and the attempted departure therefrom of Braden. Goldberg v. Chesapeake & O. R. Co., 211 Ky. 115, 276 S. W. 1087.

To hold them in such circumstances to any greater duty is to be forgetful they are mere men—the equivalent of imposing upon them the duty of exercising the wisdom and foresight of omnipotency.

It should be plain that it is our opinion that Braden's right to recover of the railroad company must be determined by the facts occurring after the taxi came to a full stop. Then and not until then can his rights be regarded within the sphere of a pedestrian with the right to use the footpath, as a licensee.

The duties of the trainmen, after the taxi came to a full stop, necessarily, must be determined by the time intervening its stopping and the collision.

We are of a necessity to be governed by the testimony of Braden and Mrs. Bussell in determining the immeasureably short time the taxi stopped before Braden sustained his injury. It is true that witnesses expressed their opinions as to where the train was at the time the taxi stopped and as to the number of minutes that expired from the moment they observed the train until it came to a stop. But it is manifest that their opinions of the number of minutes that expired after it stopped until the train struck the taxi door were formed and expressed without regard to or knowledge of the actions and movements of Braden inside of the taxi as they are minutely described by him and Mrs. Bussell.

His actions and movements from the instant the taxi stopped until its door was struck by the train, as described by both him and Mrs. Bussell, furnish to us the true criterion with which to fix the time that expired between the stopping of the taxi and the collision.

His actions and conduct after the taxi came to a full stop until the collision of the door of the taxi and the side of the train demonstrate the incalculable lapse of time between the two events with certitude, which must prevail over that determinable from the mere opinions of other witnesses. The latter's opinions fixing the time the taxi stopped before the collision are no

more than conjecture, surmise, and speculation, neither of which is sufficient to rest the verdict of the jury upon.

In attempting to alight from the taxi so near the railroad track, a reciprocal duty rested upon Braden to exercise ordinary care for his own safety (Chesapeake & O. R. Co. v. Patrick, 135 Ky. 506, 122 S. W. 820; Chesapeake & O. R. Co. v. Picklesimer's Adm'r, 135 Ky. 514, 122 S. W. 822; Chesapeake & O. R. Co. v. Hawkins (Ky.) 124 S W. 836; Illinois Cent. R. Co. v. Outland's Adm'x, 160 Ky. 714, 170 S. W. 48; Louisville & N. R. Co. v. Benke's Adm'x, 164 Ky. 798, 176 S. W. 212; Blahut v. McCahil [La. App.] 163 So. 195) which included the duty to see that which he should have seen. The rule of ordinary care did not, however, require him to anticipate danger either real or potential; yet he was under the obligation to exercise his intelligence to discover and avoid the danger caused by the negligence, if any, of those in charge of the train. Smith's Adm'r v. Cincinnati, N. O. & T. P. R. Co., supra. True it is, he was entitled to rely upon those in charge of the train to give warning by appropriate signals of the train's approach, if they had time in which to do so before the collision, after they knew, or by the exercise of ordinary care could discover that the taxi had stopped.

Accepting the actions and movements of Braden from the moment the taxi stopped until the collision as criterional of the length of time the taxi had stopped before the collision, it is very plain that those in charge of the train in such a brief space of time, by the use of human instrumentalities, could not have averted the collision of the door of the taxi and the train. Chesapeake & O. R. Co. et al. v. Harrell's Adm'r, 258 Ky. 650, 81 S. W. (2d) 10; Chesapeake & O. R. Co. et al. v. Dobson's Adm'r, 244 Ky. 162, 50 S. W. (2d) 560; McKinney's Adm'x v. Cincinnati, N. O. & T. P. R. Co. 242 Ky. 167, 45 S. W. (2d) 1031.

The necessary elements of the last clear chance doctrine as generally defined may be stated in substance as follows:

"That plaintiff has been negligent and, as a result thereof, is in a position of danger from which he cannot escape by the exercise of ordinary care; and

this includes not only where it is physically impossible for him to escape, but also in cases where he is totally unaware of his danger and for that reason unable to escape; that defendant has knowledge that the plaintiff is in such a situation, and knows, as in the exercise of ordinary care should know, that plaintiff cannot escape from such situation and has the last clear chance to avoid the accident by exercising ordinary care, and fails to exercise the same, and the accident results thereby, and plaintiff is injured as the proximate result of such failure.''

Girdner v. Union Oil Co., 216 Cal. 197, 13 P. (2d) 915, 917; Smith v. Pacific Greyhound Corporation, 139 Cal. App. 696, 35 P. (2d) 169.

The predominant, pregnant fact, the infinitesimal time between the full stop of the taxi and the collision, as tested, measured, and determined by the testimony of Braden and Mrs. Bussell herein emphasized, and the last clear chance doctrine, deprive Braden of the right to recover of the railroad company, and entitle it to a directed verdict. No other questions are decided.

Wherefore, the judgment is reversed with directions to award Hensley and the railroad company a new trial consistent herewith.

The whole court sitting.